IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

vs.                                                      CRIMINAL NO. 10-2741 MCA

**RUBEN MARTINEZ-MARTINEZ**,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant Ruben Martinez-Martinez's Motion to Suppress* [Doc. 25], filed on January 14, 2011.  On March 25, 2011, the Court held an evidentiary hearing on Defendant's *Motion*.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing and in writing subsequent to the hearing on the motion, and otherwise being fully advised in the premises, the Court denies the *Motion* based upon the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

1.   Sergeant Nick Ramos is an 19-year veteran of the New Mexico State Police Force. [Sealed Suppression Hearing Transcript, March 25, 2011, Document 51 at 14-15]

2.   On September 1, 2010, Sergeant Ramos was conducting patrol operations west of Albuquerque, New Mexico, traveling westbound on Interstate 40.  [Doc 51 at 16-

17, 20]

3.    The New Mexico Department of Public safety has issued a Golden Eagle radar

       system to Sergeant Ramos, and has trained him to use the device and to determine

       whether the device is properly functioning.  [Doc 51 at 20-21]

4.    On the morning of September 1, 2010, Sergeant Ramos checked the device and it

       appeared to be in working order.  [Doc 51 at 21-22]

5.    Using his Department-issued radar device, Sergeant Ramos "clocked" a white

       pick-up truck, with Missouri license plates, traveling eastbound at 81 miles per

       hour in a 75 mile per hour zone.  [Doc 51 at 17, 22]

6.    In response to this observation, Sergeant Ramos crossed the median, turned

       around, caught up with the white pick-up truck, pulled next to the vehicle, and

       looked into see confirm that the driver was wearing a seat belt.  [Doc 51 at 23]

7.    After determining that the driver was wearing a seat belt, Sergeant Ramos slowed

       his marked police vehicle in an attempt to get behind  the white truck and to

       conduct a traffic stop to issue a speeding citation.  [Doc 51 at 23]

8.    At the same time, the white truck slowed its speed and as a result, Sergeant Ramos

       was unable to pull behind the white truck for approximately a minute.  [Doc 51 at

       23, Exhibit 12 at 7:37:28-7:38:28]

9.    Once Sergeant Ramos pulled behind the white truck, he initiated the emergency

       lights on his vehicle.  [Doc 51 at 23; Exhibit 12 7:38:28]

10.   The driver of the vehicle responded to the emergency lights and pulled over to the

side of the road.  [Doc 51 at 24, Exhibit 12 at 7:38:28-7:38:39]

11.   I find and accept as credible Sergeant Ramos's description of the circumstances

leading up to the traffic stop.

12.   Sergeant Ramos pulled over onto the shoulder behind the white truck, exited his

police vehicle, and approached the white truck on the passenger side, for officer

safety reasons.  [Doc 51 at 30; Exhibit 12 at 7:38:39-7:39:26]

13.   When he exited the police vehicle, Sergeant Ramos inadvertently left his voice

recorder in the charger, inside the police vehicle.  [Doc 51 at 28-29]

14.   Sergeant Ramos, speaking in Spanish with Defendant throughout the encounter,

asked for Defendant's driver's license, proof of insurance, and registration.  [Doc

51 at 30, 38]

15.   Defendant's hand shook as he handed Sergeant Ramos the documents, which

included a Mexican driver's license, registration, and insurance.  [Doc 51 at 36]

16.   The Mexican license was issued to Marcos Quiterio Peña and included a

photograph of Defendant.  [Doc 51 at 32; Government's Exhibit 16]

17.   Sergeant Ramos had no means, roadside, to verify the Mexican driver's license.

[Doc 51 at 35]

18.   After receiving the paperwork, Sergeant Ramos asked Defendant to come to the

police vehicle and the discussion continued, with Sergeant Ramos out of view of

the dashboard camera and Defendant in view at the right front bumper.  [Doc 51

36; Exhibit 12 at 7:40: 46-7:41:05]

19.    Sergeant Ramos asked Defendant if his driver's license was recently issued
       because, as Sergeant Ramos testified, the license was clean, not scratched, and
       appeared "pristine."  [Doc 51 at 34, 36]

20.    Defendant kept his driver's license in a wallet, in a typical compartment with a
       piece of flexible plastic protecting the surface of the license.  [Defendant's Exhibit
       B]

21.    Defendant responded that he did not know when the license was issued and then
       stated that the license was issued three years ago.  [Doc 51 at 36]

22.    Sergeant Ramos, based on his training and experience, believed that Defendant
       was lying about the driver's license, based on Defendant's inability to maintain
       eye contact and his inconsistent replies regarding when the license was issued.
       [Doc 51 at 36-37]

23.    The Court finds that although Sergeant Ramos testified credibly regarding his
       evaluation of the driver's license, no significance can be imputed to its apparent
       newness or pristine quality because the license was kept in a typical wallet,
       beneath a protective plastic cover.

24.    The registration and insurance paperwork was in order; the only item out of place
       was that Defendant was not the registered owner of the vehicle.  [Doc 51 at 37]

25.    Sergeant Ramos began to fill out the traffic citation; he wrote the name from the
       driver's license and asked Defendant to provide a date of birth.  [Doc 51 at 40]

26.    Sergeant Ramos again asked Defendant for his name and asked where Defendant

lived; Defendant provided an address in Missouri.  [Doc 51 at 40]

27.    Defendant began to ask questions about paying the citation and Sergeant Ramos instructed him to hold his questions until after the citation was written.  [Doc 51 at 41]

28.    Defendant explained that he lived in Springfield, Missouri and that he came to Flagstaff, Arizona for five days to pick up his uncle, who was moving back to Springfield with him.  [Doc 51 at 41-42]

29.    At this point, Sergeant Ramos realized that his voice recorder was still in the police vehicle and he retrieved the microphone and put it in his pocket.  [Doc 51 at 42, 106-107; Exhibit 12 at 7:50:51]

30.    Sergeant Ramos testified credibly as to his discovery of the microphone in the vehicle and the retrieval of the microphone.

31.    Sergeant Ramos observed that there was no one else in the truck and there were no boxes or items to be moved.  [Doc 51 at 43]

32.    Sergeant Ramos asked Defendant why his uncle was not there, and Defendant responded that at the end of five days, his uncle was not ready, so Defendant simply left.  [Doc 51 at 43]

33.    Sergeant Ramos asked about the owner of the vehicle, and Defendant gave a name, saying that the owner was a friend; Sergeant Ramos followed up, asking how they knew each other, and Defendant responded that they worked together.  [Doc 51 at 43-44]

34.   The individual that Defendant named as the owner of the car was not the
individual on the car's registration.  [Doc 51 at 44]

35.   Sergeant Ramos conducted a pat-down search before leaving Defendant to check
the truck.  [Doc 51 at 46]

36.   During the pat-down search, Sergeant Ramos discovered a small tube of toothpaste
in Defendant's shirt pocket, which Sergeant Ramos felt was significant because
such an item was inconsistent with a 5 day stay in Flagstaff and four or five days
of travel. [Doc 51 at 46-47]

37.   Although Sergeant Ramos testified credibly regarding his interpretation of the
significance of the size of the tube of toothpaste, the Court finds that the toothpaste
container did not reasonably indicate or suggest any criminal behavior.

38.   Sergeant Ramos locked the door to the police vehicle and approached the truck
from the passenger side; he checked the Vehicle Identification Number at the
window and the driver's side door, comparing the VIN on the documents to those
on the vehicle.  [Doc 51 at 47, Exhibit 12 at 7:52:24-7:53:55]

39.   As he walked around the truck, Sergeant Ramos noticed one or two small suitcases
in the back, which he felt was also consistent with only a very short trip.  [Doc 51
at 47]

40.   The Court finds that although Sergeant Ramos testified credibly, his testimony
regarding the quantity of luggage in the vehicle does not give rise to any suspicion
of criminal activity.

41.    When Sergeant Ramos returned to the police vehicle, he removed the voice recorder from his pocket, left it on the seat of the vehicle, and called the El Paso Intelligence Center (EPIC) on a cellular telephone from outside the vehicle.  [Doc 51 at 48-49, 51-52]

42.    Sergeant Ramos testified that he did not want his passwords or the protocol for accessing EPIC to be captured on a recording.  [Doc 51 at 51-52]

43.    Sergeant Ramos testified credibly regarding the removal of his microphone during the EPIC call.

44.    Personal cell phone records subpoenaed and reviewed *in camera* by this Court confirm that Sergeant Ramos called EPIC at 7:50 a.m. on September 1, 2010.  [Doc 57]

45.    EPIC reported "no returns" on the name and date of birth given by Defendant or the vehicle's license plate.  [Doc 51 at 50]

46.    Sergeant Ramos testified that if the identity on the Mexican driver's license were legitimate, EPIC would report some border crossings associated with the identity.  [Doc 51 at 50-51].

47.    The phone call to EPIC lasted for approximately seven (7) minutes.  [Doc 51 at 52-53; Doc 57]

48.    After talking to EPIC, Sergeant Ramos again tried to clarify Defendant's story and asked him how long he'd had the license; Defendant again responded three years.  [Doc 51 at 54]

49.   Defendant stated that he was from Mexico and got the driver's license there, that he went to Flagstaff, and that he was there for three days—a change from his earlier report that he was in Flagstaff for five days.  [Doc 51 at 54-55]

50.   Sergeant Ramos asked whether the uncle in Flagstaff was his mother's or his father's brother; Defendant repeated the question and then answered that the uncle was his mother's brother.  [Doc 51 at 55]

51.   Sergeant Ramos asked for the uncle's name; Defendant again repeated the question and answered "Pedro."  [Doc 51 at 56]

52.   When Sergeant Ramos asked for "Pedro's" last name, Defendant responded "Quitero" and then changed his answer to "Mendez."  [Doc 51 at 56]

53.   Sergeant Ramos testified that in his experience, a person who repeats a question after being asked, could be employing a tactic to avoid answering the question truthfully  [Doc 51 at 55]

54.   Sergeant Ramos again questioned Defendant about the owner of the truck, asking whether the owner is in Missouri and whether Defendant has the owner's phone number; Defendant responds that the owner's phone number is his cell phone.  [Doc 51 at 56]

55.   Defendant told Sergeant Ramos that he could retrieve the cell phone from the truck in order to check for the owner's phone number.  [Dc 51 at 56]

56.   Sergeant Ramos returned to the truck, retrieved the phone, and gave the phone to Defendant.  [Doc 51 at 56-57; Exhibit 12 at 8:05:51-8:06:20]

57.   Sergeant Ramos did not search the truck when he retrieved the phone.  [Doc 51 at 57]

58.   Defendant looked at his phone and said that he did not have the owner's phone number.  [Doc 51 at 57]

59.   Sergeant Ramos returned the phone to the truck.  [Doc 51 at 57; Exhibit 12 at 8:06:59-8:07:26]

60.   When Sergeant Ramos returned to Defendant, Defendant asked what was flying in the sky, and Sergeant responded that it's an airplane.  [Doc 51 at 57-58]

61.   Sergeant Ramos explained the citation to Defendant and begins to discuss the fine, but realizes that he doesn't have that part filled out, and he proceeds to look up the amount of the fine.  [Doc 51 at 58]

62.   Sergeant Ramos continues to explain the citation, Defendant says that he wants to pay the fine, and Sergeant Ramos explains that he can either pay the fine or have a court appearance.  [Doc 51 at 58]

63.   Sgt Ramos explained the citation in Spanish and in English.  [Doc 51 at 58]

64.   Sergeant Ramos issued the citation, returned Defendant's documents, asked whether he had returned everything to Defendant, and Defendant said that everything was returned.  [Doc 51 at 59]

65.   When listening to the recording at the hearing, Sergeant Ramos did not hear himself tell Defendant that he was free to leave.  [Doc 51 at 129]

66.   Sergeant Ramos said thank  you, Defendant responded "thank you," and at 8:10

a.m., he began to walk away. [Doc 51 at 59-61; Exhibit 12 at 8:10:04-8:10:11]

67.  Sergeant Ramos stopped him, said he had more questions, and asked if Defendant would talk to him. [Exhibit 12 at 8:10:10-8:10:16]

68.  Sergeant Ramos could not recall whether he told Defendant that he was free to leave or that he was not required to answer additional questions.  [Doc 51 at 129]

69.  Defendant agreed to talk.  [Doc 51 at 61]

70.  The audio recording reveals that Sergeant Ramos did not yell or speak aggressively, to the contrary his voice sounds cordial and pleasant.

71.  Sergeant Ramos asked about travel plans again, Defendant stated that he did not go to Mexico, that he stayed in Flagstaff for a period of days, and that he did not pick up his uncle.  [Doc 51 at 63]

72.  When Sergeant Ramos asked where the uncle lived, Defendant did not have an address, he could say only "Flagstaff."  [Doc 51 at 65]

73.  Sergeant Ramos assured Defendant that he, Sergeant Ramos, was not with immigration.  [Doc 51 at 65]

74.  Sergeant Ramos asked whether Defendant had a lot of money, weapons, or any drugs (including cocaine, marijuana, heroin, and methamphetamine; Defendant responded that he was not, but he broke eye contact when answering questions regarding cocaine and methamphetamine.  [Doc 51at 65-66]

75.  Sergeant Ramos asked Defendant for permission to search the truck and Defendant gave consent to search.  [Doc 51 at 66]

76.     Sergeant Ramos retrieved a consent to search form and asked Defendant whether he read better in English or Spanish.  [Doc 51 at 66]

77.     Defendant responded that he read better in Spanish, and Sergeant Ramos requested that he read the form.  [Doc 51 at 67]

78.     Defendant read the form out loud and then signed it.  [Doc 51 at 67]

79.     Sergeant Ramos told Defendant that if he had any problems or questions to call out, but not to move towards the vehicle.  [Doc 51 at 67]

80.     Defendant asked whether he could sit, and Sergeant Ramos responded that he could.  [Doc 51 at 67-68]

81.     Defendant was not handcuffed.  [Doc 51 at 68]

82.     At 8:12 a.m., according to cell phone records, Sergeant Ramos called Officer Velasquez  prior to searching, in order to request a K-9 unit.  [Doc 51 at 53,68]

83.     The Court finds that there is a discrepancy between the time stamp on the video exhibit and the cell phone records because the cell phone  record clearly indicates that Sergeant Ramos called Officer Velasquez at 8:12 a.m. and the time stamp on the video exhibit indicates that Sergeant Ramos did not make another cell phone call until 8:16:39 a.m. [Exhibit 12 at 8:13:00-8:16:39]

84.     Despite the discrepancy in time stamps, from the evidence presented at the hearing, the Court finds that Sergeant Ramos did not call for a K-9 unit until after Defendant consented verbally and signed the consent to search form.

85.     Sergeant Ramos hand searched the truck until a K-9 unit arrived.  [Doc 51 at 68]

86.     The K-9 was deployed on the vehicle and alerted positively.  [Doc 51at 68]

87.     After the K-9 alert, a more thorough search was conducted, including an echo test

on the spare tire, the result of which indicated that an object was in the tire.  [Doc

51 at 69]

88.     Sergeant Ramos  told Defendant that there was something in the tire and asked for

permission to cut into the tire; Defendant agreed.  [Doc 51 at 71]

89.     Inside the tire, Sergeant Ramos found a silver object strapped down to the tire

[Doc 51 at 72; Government's Exhibit 4]

90.     After a field test, it was determined that the silver object contained

methamphetamine.  [Doc 51 at 72]

91.     During the encounter, Sergeant Ramos did not draw his weapon and apart from the

pat-down search, did not touch Defendant.  [Doc 51 at 72-73]

92.     Defendant was charged by Indictment with intentionally possessing, with intent to

distribute, 500 grams or more of a mixture and substance containing a detectable

amount of methamphetamine, contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(A) and

18 U.S.C. § 2.  [See Doc 11]

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On January 14, 2011, Defendant filed *Defendant  Ruben Martinez-Martinez'*

*Motion To Suppress*, in which he challenges the basis for the initial traffic stop, the length

of his detention, and the validity of his consent to search.  [Doc 25]  Specifically,

Defendant argues that the Government did not establish that he was actually committing a

speeding violation at the time that Sergeant Ramos conducted the stop.  He also argues that if the stop was justified, the length of his detention roadside impermissibly exceeded the scope of the stop.  Finally, Defendant contends that he did not voluntarily consent to the search of the truck.

As a preliminary matter, at the suppression hearing, the Government and Defendant offered into evidence separate transcripts of the encounter, both of which contain Spanish-to-English translations.  Each party disputes the accuracy of the opposing party's proposed transcript, and both sides acknowledge that neither transcript is completely accurate.  Having reviewed the transcripts and the audio and video recordings, the Court finds that the Defendant's Exhibit C is a reasonably accurate recording of the Spanish conversation.  The Government does not dispute that the Spanish that was recorded was accurately translated into English.  Accordingly, the Court adopts Defendant's Exhibit C.

## A.      Fourth Amendment Standards

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  See Hunnicutt, 135 F.3d at

1348.

A traffic stop is "justified at its inception" when the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring." Id. at 1348.  During the course of a lawful investigatory stop, a police officer "may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" Arizona v. Johnson, 129 S.Ct. 781, 786 (2009) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 111, n. 6 (1977)).  In order to investigate a perceived traffic violation, the officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  See United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity or (2) the driver consents to additional questioning.  Id.

When determining whether there was reasonable suspicion, a court must look to the 'totality of the circumstances' to see whether the officer had a 'particularized and objective basis for suspecting legal wrongdoing.'" United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  Whether consent is given is a question of fact, determined by the totality of the circumstances.  United States v. Silva-Arzeta, 602 F.3d 1208, 1213 (10th Cir. 2010).  "The central question is whether a reasonable person would believe he was free to . . . disregard the officer's request."  Id. at 1214(alteration in original) (internal quotation

marks and citation omitted).   This consent inquiry focuses on whether "the defendant suffered, inter alia, physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery." Id. at 1214 (internal quotation marks and citation omitted).   Further, "a defendant's consent to a search may be voluntary even when the consenting party was not informed he could refuse."   United States v. Carbajal-Iriarte, 586 F.3d 795, 799 (10th Cir. 2009).

## B.   The Stop

At the outset, Defendant challenges whether the traffic stop was justified at its inception; *i.e.*, whether Sergeant Ramos had reasonable suspicion that a traffic violation had occurred.  [Doc 25 at 7-8]  Specifically, Defendant contends that he was not speeding at the time that Sergeant Ramos initiated the stop.  [Id. at 8]  Defendant maintains that the record does not at this time reflect whether Sergeant Ramos used radar equipment, whether that equipment was in good condition, or whether he simply "clocked" Defendant's speed using the squad car speedometer.  [Id.]  The potential for mistakes in calibration or observation, Defendant argues, could undermine Sergeant Ramos' justification for the stop.

The Government responds that Sergeant Ramos used radar equipment.  [Doc 30 at 6]  The Government further contends that whether the equipment was in good working order is irrelevant, because Sergeant Ramos relied in good faith on the equipment.  [Id.] If the equipment malfunctioned that would effect the factual, rather than the legal, premise for the stop.  [Id.]  According to the Government, such reasonable mistakes of

fact do not inform the reasonable suspicion inquiry.  [Id.]

Indeed, "an officer's objectively reasonable mistake of fact may support the reasonable suspicion or probable cause necessary to justify a traffic stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009). At the Suppression Hearing, Sergeant Ramos credibly testified that he was issued radar equipment, that he was trained to use the radar equipment, and that he was trained to ensure the radar equipment was functioning properly.  He credibly testified that specifically on September 1, 2010, the date of the stop, the radar equipment was in working order.  Further, Sergeant Ramos testified that he used the radar to "clock" Defendant's vehicle traveling in excess of the posted speed limit, at 81 miles per hour in a 75 mile per hour zone.  Given this testimony, it was reasonable for Sergeant Ramos to rely on the radar equipment.  If that equipment malfunctioned—and there is no evidence to suggest that it did—the subsequent stop was based on an objectively reasonable mistake of fact.  Such a mistake of fact may provide the basis for the necessary reasonable suspicion to justify a traffic stop.  See Winder, 557 F.3d at 1134.

Based on this testimony, the Court finds that Sergeant Ramos relied in good faith on his issued equipment and that the equipment indicated that Defendant was speeding. Any mistaken calibration or malfunctioning equipment does not effect the reasonable suspicion calculus because Sergeant Ramos reasonably relied on the equipment to observe a traffic violation, and it is well established that there is "no room to doubt the validity of a traffic stop based on an observed traffic violation." Id. at 1135.

Defendant further argues that Sergeant Ramos initiated the stop based on racial profiling and not on speeding.  For support, Defendant points to the time that elapsed between Sergeant Ramos checking to make sure that the driver was wearing a seat belt and initiating the stop.  He contends that Sergeant Ramos's explanation for the lapse of nearly a minute while he rode parallel to Defendant's vehicle is "not credible."  [Doc 52 at 7]  Despite Defendant's concern for the time lapse, at that time, the evidence supports this Court's finding that Sergeant Ramos had already observed a traffic violation. Accordingly, any subjective motivation that Sergeant Ramos may have had for initiating the stop is "legally irrelevant" because an objectively reasonable officer would have had probable cause to initiate a traffic stop to address the speeding infraction.  United States v. Polly, 630 F.3d 991, 997 (10th Cir. 2011) (noting that even if the defendant is correct and a traffic stop is a ruse to further some subjective goal, the stop is objectively justifiable under the Fourth Amendment if the officer observed a traffic violation).

Accordingly, the traffic stop was sufficiently justified at its inception.

**C.    Length of Detention**

Having determined that the stop was justified at its inception, the Court next considers whether Sergeant Ramos's actions "during the stop [were] reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009) (internal quotation marks and citation omitted).  As was previously stated,

> A law enforcement officer conducting a routine traffic stop may request a
> driver's license and vehicle registration, run a computer check, and issue a
> citation.  When the driver has produced a valid license and proof of
> entitlement to operate the car, the driver must be allowed to proceed
> without further delay for additional questioning.

Id. (internal quotation marks and citation omitted).  In addition, our Circuit has held that

"questions relating to a driver's travel plans ordinarily fall within the scope of a traffic

stop and that such questions are permissible so long as they do not prolong the stop. . . ."

Id. (internal quotation marks and citations omitted).  A traffic stop may be further

"expanded beyond its original purpose if during the initial stop the detaining officer

acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a

particularized and objective basis for suspecting the particular person stopped of criminal

activity."  United States v. White, 584 F.3d 935, 949 (10th Cir. 2009) (internal quotation

marks and citation omitted).

Defendant contends that the traffic stop was unreasonably prolonged.  [Doc 25 at

8]  According to Defendant, Sergeant Ramos stopped Defendant at 7:38 a.m. and issued

the speeding ticket at 8:08 a.m..  [Id.]  Defendant argues that Sergeant Ramos improperly

delayed writing the citation, questioned Defendant at length during the writing of the

citation, did not proceed directly to checking the VIN number, and lingered too long over

the VIN number.  [Id. at 8-9]  Defendant states that "once the officer had all the

information he needed to write a citation, he should have done so."  [Id. at 10]  Defendant

sets forth the time line as follows:  Sergeant Ramos questioned Defendant for six minutes

before he began to write the citation; eight minutes elapsed before Sergeant Ramos left

Defendant to check the VIN; Sergeant Ramos took two minutes to check the VIN at the dashboard and the driver's side door; next, six minutes passed while Sergeant Ramos contacted EPIC to attempt to verify Defendant's identify and check on whether the truck has recently crossed the Mexican border; and another six minutes were spent explaining the ticket to Defendant.  [Id. AT 8-9]

The Government maintains that Sergeant Ramos acted reasonably (1) because he was required to conduct the traffic stop safely alongside a busy highway; (2) because Defendant does not speak English and although Sergeant Ramos speaks Spanish, the language barrier caused some delay; and (3) Sergeant Ramos could not validate Defendant's Mexican driver's license at the roadside and so was required to ask additional questions.  [Doc 30 at 7-8]  The Government further posits that Sergeant Ramos was permitted to check the VIN both on the dashboard and at the door, so long as he did not enter the vehicle.  [Id. at 8]  Alternatively, the Government argues that Sergeant Ramos was justified in asking additional questions because during the stop, he developed reasonable suspicion of criminal activity, based on Defendant's behavior and answers to questions.  [Id. at 9]

In reviewing the time line set forth by Defendant, it is difficult to pinpoint which activity was asserted to be unconstitutionally prolonged.  Defendant objects to the periods of questioning and to the inspection of both VIN locations.  According to the Government, Sergeant Ramos's questions related to Defendant's identity and his travel plans.  Defendant does not appear to dispute this.  In the first six minutes, prior to

beginning to write the citation, Sergeant Ramos observed shaking hands, reviewed a

"new-looking" Mexican driver's license, and was informed by Defendant first that he did

not know when he got the license and then that the license was three years old.  Although

Sergeant Ramos made much of the newness and "pristine" appearance of the driver's

license, this circumstance did not suggest criminal activity or even false identity.  The

initial conversation was reasonably related to the purpose of the stop:  identifying

Defendant and determining whether he possessed a valid driver's license.

        During the next eight minutes, Sergeant Ramos continued to question Defendant,

while he wrote the citation.  Defendant contends that these questions related to

Defendant's travel plans and his story that he was returning from picking up his uncle,

who was not present in the vehicle.  See Villa, 589 F.3d at 1339 (concluding that it was

"entirely reasonable" for the trooper question the defendant about travel plans while he

wrote out the ticket so long as the questions did not prolong the stop).  These questions,

relating to Defendant's  travel plans, did not prolong the stop because Sergeant Ramos

continued to write the traffic citation during the questioning.  See United States v. Davis,

__ F.3d __, 2011 WL 668117, *4 (10th Cir. 2011) ("An officer may also question the

driver about matters both related and unrelated to the purpose of the stop, as long as those

questions do not prolong the length of the detention." (internal quotation marks and

citation omitted)); United States v. Santana-Garcia, 264 F.3d 1188, 1193 (10th Cir. 2001)

("Questions about travel plans are routine and may be asked as a matter of course without

exceeding the proper scope of a traffic stop." (internal quotation marks and citation

omitted)).

In addition, Defendant's story was inconsistent—he stated that he was in Flagstaff to retrieve his uncle, but the truck contained no other person.  He presented Sergeant Ramos with an unverifiable Mexican driver's license and with registration and insurance papers that while in order, reflected that the vehicle was not registered to or owned by Defendant.  See United States v. Ludwig, ___ F.3d ___, No. 10-8009, * 9 (10th Cir. April 22, 2011) (observing that the registration of a stopped vehicle to an absent third party is a factor that is "relevant to the reasonable suspicion analysis).  In addition, Sergeant Ramos noted that Defendant seemed nervous.  See United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007) (noting that nervousness contributes to the calculus, even if it is only limited significance in determining whether reasonable suspicion exist[s]" (alteration in original) (internal quotation marks and citation omitted)).  This eight-minute period was spent attempting to ascertain Defendant's identity, writing the citation, asking about Defendant's travel plans, and asking reasonable follow-up questions when  Defendant's story became inconsistent.  These activities were not unreasonable, as the facts known to Sergeant Ramos continued to develop.  See Adams v. Williams, 407 U.S. 143, 145 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

Next, Defendant challenges Sergeant Ramos' VIN-checking procedure, citing United States v. Caro, 248 F.3d 1240 (10th Cir. 2001).  In that case, the officer first

matched the VIN number on the car's registration to the windshield VIN and then asked

the driver to get out of the car so that he could also match the registration VIN to the

driver's side door VIN.  Id. at 1242-43.   When the door was opened, the officer observed

several air fresheners in the car, which  triggered a suspicion that the car carried drugs—a

suspicion that was borne out by a subsequent search.  Id. at 1243.  The relevant question

before the Circuit was whether "once Trooper Avery had compared the dashboard VIN to

the VIN on the car's registration, and had determined that they matched, Trooper Avery's

suspicions should have been sufficiently dispelled such that further detention on the basis

that the vehicle [might] be stolen was no longer valid."  Id. at 1244 (alteration in original)

(internal quotation marks and citation omitted).  In response to this question, the Circuit

held that

> where the dashboard VIN plate is readable from outside the passenger
> compartment, that VIN matches the VIN listed on the registration, and there
> are no signs the plate has been tampered with, there is insufficient cause for
> an officer to extend the scope of a detention by entering a vehicle's
> passenger compartment for the purpose of further examining any VIN.

Id. at 1246.  Importantly, the Circuit qualified its holding, stating that although the officer

did not have reasonable suspicion to enter the passenger compartment of the vehicle to

inspect the second VIN number, it was "possible" that the officer nevertheless "could

have continued to *detain and question* [the defendant]" based on the officer's otherwise

articulated reasonable suspicion.  Id. at 1246-47.

     The Government contends that the holding in Caro was limited by United States v.

Chavira, 467 F.3d 1286 (10th Cit. 2006).  In Chavira, the officer first checked the VIN on

the dashboard and then followed his "normal practice" of also checking the VIN on the

doorjamb.  Id. at 1288.  The defendant argued that the subsequent search of his vehicle

and the discovery of contraband were the "fruit of the . . . the inspection of the VIN

located on the doorjamb."  Id. at 1291.  The Circuit disagreed.  In order for evidence to be

suppressed as the fruit of the poisonous tree, the unlawful search must be "*at least* the

but-for cause of its discovery."  Id.  The "but-for relationship" requires  a "factual nexus

between the illegality and the challenged evidence."  Id.  In order to establish a factual

nexus, the defendant must provide "evidence at the suppression hearing showing the

evidence sought to be suppressed would not have come to light but for the government's

unconstitutional conduct."  Id. (internal quotation marks and citation omitted).

The Chavira Court continued and explained that in that case, the inspection of the

doorjamb "uncovered no contraband" and that the evidence discovered during the

officer's examination of the doorjamb had "no demonstrated connection to what occurred

next."  Id. at 1292.  Accordingly, because there was "no indication that the trooper would

not have requested or obtained consent to search the truck but for the inspection of the

VIN on the doorjamb," the viewing of the doorjamb VIN had no factual nexus to the

challenged evidence.  Id. at 1291-92.

Similarly, in the present case, although Sergeant  Ramos inspected both VIN

locations, there is no indication that he would not have also requested Defendant's

consent to search.  Defendant points to no evidence at all that any contraband was

discovered as a result of Sergeant Ramos' viewing of the doorjamb VIN.  In <u>Caro</u>, the officer did not begin to suspect drug activity until the door was opened and the multiple air fresheners were observed.  248 F.3d at 1243.  In the present case, the open door led to no additional evidence or suspicion.  Although Defendant includes this argument among his other arguments that the detention was unreasonably long, the video confirms that the extra VIN viewing took little time—the observation of the doorjamb VIN did not unreasonably prolong the detention.

After checking the VIN numbers, Sergeant Ramos returned to the police vehicle and spent six minutes contacting EPIC in order to attempt to verify Defendant's identity and to determine whether the truck had recently crossed the border with Mexico.  The call was brief, no longer than necessary to attempt to verify Defendant's identity, and was within the scope of the traffic stop.

Sergeant Ramos disconnected with EPIC and began to question Defendant further about his travel plans and his uncle.  At this point, Sergeant Ramos had reasonable suspicion of criminal activity, sufficient to justify further detention of Defendant.  EPIC reported no returns on Defendant's identity, as set forth on his driver's license. According to Sergeant Ramos, EPIC would report any border crossings associated with this identity.  The lack of border crossings associated with this identity, after Defendant reported that he was from Mexico, raised suspicions that this was not an identity that truly originated in Mexico and thus, not Defendant's valid driver's license.  This information, in addition to Defendant's inconsistent story, provided a factual basis for reasonable

suspicion that criminal activity was afoot.  See United States v. Fox, 600 F.3d 1253, 1259

(10th Cir. 2010) ("Investigative detentions are reasonable if the detaining officer has a

reasonable suspicion that criminal activity may be afoot." (internal quotation marks and

citation omitted)).

Although he continued to write the citation, Sergeant Ramos also continued to ask

Defendant a great number of questions, all related to his identity and his travel plans.

These questions were asked in furtherance of Sergeant Ramos's reasonable suspicion that

Defendant was engaged in criminal activity.   Subsequently, Defendant claims that a

period of six minutes  was expended  while Sergeant Ramos "begins to explain the ticket"

to Defendant.  [Doc 25 at 9]  Defendant does not make a specific argument with regard to

this period of time.  It would appear that this time was reasonably related to the purpose

of the stop—speeding—and the issuing of the ticket.

Each segment of the stop, as Defendant articulates it, was reasonably related to the

purpose of the stop or was supported by reasonable suspicion.  At the beginning of the

stop, Sergeant Ramos was attempting to gather sufficient information to write the citation

and verify Defendant's identification, but after the call to EPIC, Sergeant Ramos

developed reasonable suspicion of criminal activity, which supported the additional

questions.  The totality of the circumstances, as supported by the evidence admitted at the

suppression hearing, demonstrates that before Sergeant Ramos issued the ticket, the stop

was not unreasonably prolonged but instead reasonably related to the issuance of the

ticket and eventually, supported by reasonable suspicion of criminal activity.  See United

States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004) ("[T]he length of the stop and the potential intrusion on an individual's Fourth Amendment rights must be juxtaposed against the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." (internal quotation marks and citation omitted)).

## D.    Consent to Search

Defendant also contends that his consent to search was not voluntary.  He argues that his signature on the consent form was coerced by Sergeant Ramos and that there was no break between the purportedly illegal detention and the consent.  [Doc 25 at 21-22] Turning first to coercion, Defendant contends that Sergeant Ramos directed his movements, engaged the patrol lights, asked irrelevant and aggressive questions, and did not inform Defendant that he was free to decline to answer.

None of Defendant's arguments, nor the evidence proffered at the hearing, address the factors related to coercion that have been articulated by our Circuit.  Specifically, this Court considers the totality of the circumstances, including

> the location of the encounter . . .; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

Carbajal-Iriarte, 586 F.3d at 801 (alteration in original) (internal quotation marks and

citation omitted).  The only factor that is arguably met is that after Sergeant Ramos asked Defendant if he would consent to further questioning, he did not inform Defendant that he could end the encounter at any time.  That factor, alone, is not dispositive.  See id. at 799 ("[A] defendant's consent to a search may be voluntary even when the consenting party was not informed he could refuse.").  Further, other factors have been considered to weigh against coercion include "an officer's pleasant manner and a tone of voice that is not insisting, a public location such as the shoulder of an interstate highway, in public view, and the prompt return of the defendant's identification and papers."  Ledesma, 447 F.3d at 1314 (internal quotation marks and citations omitted).  Based on the evidence presented at the hearing, the circumstances support the latter factors and a finding that a reasonable person would have felt free to refuse the requested search.

Defendant also argues that the taint of the illegal initial detention infected the subsequent consent.  For this proposition, Defendant cites United States v. McSwain, 29 F.3d 558 (10th Cir. 1994).  In that case, the Circuit first concluded that the initial detention was unlawful—because the officer continued to question and probe after the suspicion justifying the stop was resolved.  Id. at 561-62.  After that, the Circuit was required to evaluate whether a consent to search was nevertheless valid.  Id. at 562. Under those circumstances, the Government must establish "both 1) that the consent was voluntary in fact, and 2) that there was a break in the causal connection between the illegal detention and the consent."  Id. at 562, n.2.   The Court has already concluded that the initial detention was not illegal. As a result, the McSwain analysis does not apply.

## III.    CONCLUSION

For the foregoing reasons, Defendant's *Motion* is denied.

**IT IS THEREFORE ORDERED** that *Defendant Ruben Martinez-Martinez's Motion to Suppress* [Doc. 25] is **DENIED**.

**SO ORDERED** this 5th day of July, 2011, in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
United States District Judge